IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

HARTFORD CASUALTY INSURANCE CO, )
                            Plaintiff, )
          v.                          )
                                      )   No. 11 C 7498
CONSTRUCTION BUILDERS IN MOTION,      )
INC., TADEUSZ KOCANDA, KGP, INC.,     )   Judge Virginia M. Kendall
KAISER DESIGN GROUP, LTD., JEAN       )
KAISER, as representative of the estate of Jay )
Kaiser,    NAUTILUS    INSURANCE      )
COMPANY,     PEKIN     INSURANCE      )
COMPANY, UNITED FIRE & CASUALTY       )
INSURANCE COMPANY, and ROCKFORD       )
MUTUAL INSURANCE COMPANY,             )
                         Defendants.  )
_____ )
NAUTILUS INSURANCE COMPANY,           )
                     Cross-Plaintiff, )
          v.                          )
                                      )
KGP, INC., KAISER DESIGN GROUP,       )
LTD., JEAN KAISER as representative of the )
estate of Jay Kaiser, and NANCY GIDWITZ, )
                    Cross-Defendants. )
_____ )
ROCKFORD MUTUAL INSURANCE CO,         )
                     Cross-Plaintiff, )
          v.                          )
                                      )
KGP, INC., KAISER DESIGN GROUP,       )
LTD., and JEAN KAISER as representative of )
the estate of Jay Kaiser,             )
                    Cross-Defendants. )
_____ )
ROCKFORD MUTUAL INSURANCE CO.,        )
                Third-Party Plaintiff, )
          v.                          )
                                      )
NANCY GIDWITZ, and PAWEL & SON        )
CONSTRUCTION, INC.,                   )
                Third-Party Defendants. )

1

## MEMORANDUM OPINION AND ORDER

This is an insurance coverage dispute regarding an insurer's duty under a commercial general liability ("CGL") policy to defend and indemnify an insured in an underlying case regarding the construction of a residence. Nancy Gidwitz ("Gidwitz") filed a suit ("the Underlying Action") against defendants KGP Inc., Kaiser Design Group, Ltd., and Jean Kaiser, as representative of the Estate of Jay Kaiser (collectively "the Kaiser Defendants"), alleging defective construction and faulty design and workmanship. The Kaiser Defendants in turn filed two third-party complaints against subcontractors: a third-party complaint against Pawel & Son Construction, Inc. ("Pawel"), the masonry subcontractor, alleging breach of contract, equitable subrogation, and contribution in the event Gidwitz prevails on her claim against the Kaiser Defendants in the Underlying Action; and a third-party complaint against Construction Builders in Motion, Inc. ("CBM"), a carpentry subcontractor on the Gidwitz home, and CBM's owner Tadeusz Kocanda ("Kocanda" and together with CBM, the "CBM Defendants") for indemnification and contribution, also in the event that Gidwitz prevails in the Underlying Action.

Plaintiff Hartford Casualty Insurance Company ("Hartford") filed the instant suit against various insurance carriers, the Kaiser Defendants, and the CBM Defendants. Hartford seeks declaratory judgment that Hartford is not obligated to defend or indemnify the CBM Defendants or the Kaiser Defendants under the CGL policies (the "Hartford Policies") it issued to "Ted Kocanda DBA Construction in Motion" with the Kaiser Defendants as additional insureds. In the event Hartford is obligated to defend or indemnify the Kaiser Defendants in the Underlying Action, Hartford seeks a declaration that Nautilus, Pekin, Rockford and United Fire are also obligated or indemnify the Kaiser Defendants and contribute to the Kaiser Defendants' defense.

2

Rockford Mutual Insurance Company ("Rockford"), who has a CGL policy with Pawel (the "Rockford Policy") filed a cross-claim against the Kaiser Defendants for a declaration that it has no duty to defend and indemnify the Kaiser Defendants as additional insureds under the Rockford Policy  Nautilus Insurance Company ("Nautilus") also filed a cross-claim against the Kaiser Defendants seeking a declaration that it has no duty to defend and indemnify the Kaiser Defendants under its CGL insurance policy with KGP, Inc. ("the Nautilus Policy").

Presently before the court are three motions for summary judgment.  Each of Hartford, Rockford, and Nautilus (together, the "Moving Insurers") moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment against the Kaiser Defendants, and in some cases others, seeking a declaration that the undisputed material facts show that each Moving Insurer has no obligation to defend or indemnify the Kaiser Defendants in the Underlying Action and likewise no obligation to defend third party subcontractors, in each case because the complaint filed in the Underlying Action (the "Underlying Complaint") does not allege or potentially allege an "occurrence" or "property damage," or, in the altenrative, because the exclusions contained in each of the Moving Insurers' policies serve to otherwise eliminate any coverage that might otherwise exist.

For the reasons stated herein, the Moving Insurers' motions for summary judgment are granted because the Underlying Complaint does not allege "property damage" or an "occurrence" triggering a duty to defend.

<u>**STATEMENT OF MATERIAL UNDISPUTED FACTS**</u>[1]

**I.      The Underlying Action**

On April 9, 2012, Nancy Gidwitz filed the six-count Underlying Complaint in the Circuit Court of Cook County, naming the Kaiser Defendants as defendants. (Rockford 56.1 at ¶¶ 21, 23; Hartford 56.1 at ¶ 10.)  The Underlying Action alleges that Gidwitz entered into an agreement with KGP, Inc. ("KGP") effective October 1, 2004 for the design and construction of a single-family home for herself. (Rockford 56.1 at ¶ 22(a).)  Gidwitz alleges that KGP and Kaiser Design Group, Ltd ("Kaiser Design") entered into a subcontract under which Kaiser Design would serve as the architect on the Gidwitz project and that Gidwitz was a third party beneficiary on the subcontract. (*Id.* ¶ 22(b).)  Gidwitz states that in May or June of 2007, she began communicating with the Kaiser Defendants regarding defective work because the plans prepared by the Kaiser Defendants for the heating and cooling system for the Gidwitz project contained material errors and inconsistences. (*Id.* ¶ 22(f)-(g).)  According to Gidwitz, the Kaiser Defendants failed to take any corrective action and on October 19, 2007, Gidwitz terminated the contract with KGP and engaged other contractors to complete the work. (*Id.* ¶ 22(h).)  Gidwitz also alleges claims against the Kaiser Defendants for negligence and fraud. (Hartford 56.1 at ¶ 10).

In the course of inspecting the Kaiser Defendants' work, Gidwitz states that she discovered defects, including but not limited to: (1) flattened HVAC ducts in an attempt to install level ceilings; (2) water line puncture during installation of drywall; (3) damage to wooden flooring caused by water line punctures; (4) cracks in the garage walls caused by deflection of

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Facts as follows: citations to Hartford's 56.1 Statement of Material Facts [Dkt. 175] are "Hartford 56.1 at ¶__"; citations to Nautilus' Rule 56.1(a) Statement of Material Facts [Dkt. 170] are "Nautilus 56.1 at ¶__";

lintel above the garage door; (5) scratched door jambs caused by improper jamb thickness; (6) damage done to the cabinetry occurring during tear-out of drywall to uncover and replace previous duct work; (7) defects in framing, drywall, and finish carpentry; (8) defects in the alignment of ceilings, walls, and cabinetry; (9) poorly designed and poorly installed coping and parapet causing efflorescence staining on certain parts of the exterior masonry walls; and (10) defects in the design and installation of the hydronic heating system. (Rockford 56.1 at ¶ 22.)

In the Underlying Complaint, Gidwitz alleged that KGP breached various provisions of its agreement with Gidwitz, including but not limited to (1) its failure to meet quality specifications in its agreement, both individually and through its responsibility to assume the obligations of its subcontractors; (2) its failure to properly coordinate the activities of its subcontractors to avoid delay and ensure that all work met applicable standards; and (3) its failure to perform duties in accordance with standards of professional care. (Rockford 56.1 at ¶ 22(i), Nautilus 56.1 at ¶ 19). Gidwitz alleged the same facts under a negligence standard as a separate claim against KGP. (Nautilus 56.1 at ¶ 23).

Gidwitz also alleged that Kaiser Ltd. breached various provisions of its agreement, including but not limited to its failures to meet the specifications in its agreement and its failure to perform design functions in accordance with the standards of professional care. (Rockford 56.1 at ¶ 22(j), Nautilus 56.1 at ¶ 20). As with KGP, Gidwitz alleged factually identical allegations against Kaiser Ltd. but under a negligence standard. (Nautilus 56.1 at ¶ 24).

Finally, Gidwitz alleged that Jay Kaiser failed to properly capitalize KGP or Kaiser Ltd. and that Gidwitz should be permitted to pierce the corporate veil to recover against Jay Kaiser. (Nautilus 56.1 at ¶ 21). She also alleged that Jay and Jean Kaiser intentionally withheld critical

information about Jay Kaiser's medical condition in order to induce Gidwitz to enter into the contract with KGP and Kaiser Ltd. (*Id.* at ¶22).

## A. The Underlying Third-Party Pawel Action

On or about November 6, 2012, the Kaiser Defendants filed a third-party complaint against Pawel (the "Underlying Third-Party Pawel Action"), the masonry subcontractor, alleging breach of contract, equitable subrogation, and contribution in the event Gidwitz prevails on her claim against the Kaiser Defendants. (Rockford 56.1 at ¶¶ 27, 29.) Specifically, the Kaiser Defendants alleged that should Gidwitz be successful in her negligence claims against any of the Kaiser Defendants, such negligence would be due in whole or in part to the negligence and contributory fault of Pawel because Pawel negligently and carelessly failed to take proper steps to protect Gidwitz's property, caused the alleged damage to Gidwitz's property through inattentiveness in its own work; installed its work in an improper manner, and failed to select materials free of defects. (*Id.* ¶ 28.) Pawel defaulted on the claims against it on September 13, 2012. (*Id.* ¶ 31.)

## B. The Underling Third-Party CBM Action

On June 3, 2009 (amended on May 22, 2012 and November 6, 2012), the Kaiser Defendants filed a third-party complaint in Underlying Action against the CBM Defendants (the "Underlying Third-Party CBM Action"). (Hartford 56.1 at ¶ 12.) In that third-party complaint, the Kaiser Defendants alleged that CBM and Kocanda are obligated to reimburse or indemnify the Kaiser Defendants in the event that Gidwitz prevails in the Underlying Action against KGP. (*Id.*)

### III.    The Nautilus Policy

Nautilus issued commercial liability policies to KGP, Inc. as the named insured, annually in March for the years 2005 until 2008. (Nautilus 56.1at ¶¶ 3,4,5).  KGP, Inc. is the named insured on each Nautilus Policy, and the form of business listed on each Nautilus Policy is "Organization, including a Corporation (but not including a Partnership, Joint Venture or LLC)." (*Id.* ¶ 8.)

### A.    Policy Coverage

Each Nautilus Policy provides that Nautilus:

> will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury' or 'property damage' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages.  However, we will have no duty to defend the insured against any 'suit' seeking damages for 'bodily injury' or 'property damage' to which this insurance does not apply.  We may, at our discretion, investigate any 'occurrence' and settle any claim or 'suit' that may result.

(*Id.* ¶ 6.)

The term "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same harmful conditions." (*Id.* ¶ 7.)  The term "property damage" is defined as:

> [p]hysical injury to tangible property, including all resulting loss of use of that property.  All such loss [sic] of use shall be deemed to occur at the [sic] time of the physical injury that caused it; or [l]oss of use of tangible property that is not physically injured such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it.

(*Id.*)  Each of the Nautilus Policies states that it applies to "Bodily Injury" and "Property Damage" only if the bodily injury or property damage is caused by an "occurrence" that takes place in the "coverage territory" and occurs during the policy period. (*Id.*)

## B.     Policy Exclusions

Each of the Nautilus Policies contains identical exclusions.  (*Id.* at ¶ 10).   The Nautilus Policies do not apply to:

- Bodily Injury or Property Damage expected or intended from the standpoint of the insured (*Id.* at ¶ 10);

- Property Damage to (i) the particular part of real property on which [the insured] or any contractors or subcontractors working directly or indirectly on [the insured's] behalf are performing operations, if the property damage arises out of those operations; or (ii) the particular part of any property that must be restored, repaired, or replaced because of "your work" was incorrectly performed on it (*Id.* at ¶ 11);

- Property Damage to "your work" arising out of it or any part of it and included in the 'products-completed operations hazard,' unless the damaged work or the work out of which the damage arises was performed on the insured's behalf by a subcontractor;

- Property Damage to "impaired property" or property that has not been physically injured, arising out of "[a] defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work;' or [a] delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms." (*Id.* ¶¶ 10–13.)  This final exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use. (*Id.* ¶ 13.)

The term "your work" is defined as "[w]ork or operations performed by you on your behalf" and "[m]aterials, parts, or equipment furnished in connection with such work or operations."  (*Id.* ¶ 7.)   This includes "[w]arranties or representations made at any time with

respect to the fitness, quality, durability, performance or use of 'your work,' " as well as the providing of or failure to provide warnings or instructions. (*Id.*) "Impaired property" means tangible property, other than "your product" or "your work" that cannot be used or is less useful because it either "incorporates 'your product' or 'your work' that is known or thought to be defective, deficient, inadequate or dangerous" or because the insured has "failed to fulfill the terms of a contract or agreement" if such property can be restored by either the repair, replacement, adjustment or removal of "your product" or "your work" or by the insured fulfilling the terms of the contract. (*Id.*)

Finally, each of the Nautilus Policies contains a blanket exception excluding from coverage "any and all operations for Kaiser Design Group." (*Id.* at ¶ 14).

## IV. The Hartford Policy

Hartford issued general liability policies to "Ted Kocanda DBA Construction in Motion" for consecutive annual policy periods from February 8, 2005 to February 8, 2010. (Hartford 56.1 St. ¶ 14.)

### A. Policy Coverage

The Hartford Policies state as followed in the Insuring Agreement for the Business Liability Coverage:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance applies. We will have the right and duty to defend the insured against any 'suit' seeking those damages. However, we will have no duty to defend and insure against any 'suit' seeking damages for 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance does not apply.

(*Id.*¶ 16.)

The Hartford Policies state that this insurance applies to bodily injury or property damage only if such injury is caused by an "occurrence" that takes place in the "coverage territory" during the policy period. (*Id.*) The term "occurrence" is defined as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* ¶ 17.) The term "property damage" means "physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or (b) Loss of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of 'occurrence' that caused it." (Hartford 56.1 at Ex. A).

**B. Notice**

The Hartford Policies further provide that the insured "and other involved insured" must "immediately send [Hartford] copies of any demands, notices, summonses or legal papers received in connection with the claim or 'suit.'" (*Id.* at ¶ 18).

On February 18, 1008, the Kaiser Defendants sent a letter to Nautilus enclosing a draft complaint for the Underlying Action. (*Id.* at ¶ 19). Gidwitz filed the Underlying Action on November 25, 2008. (*Id.* at ¶ 20). On May 11, 2009, counsel for the Kaiser Defendants sent a letter to Hartford tendering their defense in the Underlying Action as additional insureds. (*Id.* at ¶ 21).

On August 6, 2009, Hartford agreed to participate in the Kaiser Defendants' defense of the Underlying Action subject to a complete reservation of rights to deny coverage and withdraw from participation. (*Id.* at ¶ 22). Hartford determined that the Kaiser Defendants were not entitled to coverage under the Hartford policy in effect from February 8, 2004 to February 8, 2005 because it expired prior to execution of the construction subcontract at issue in the

Underlying Action, and fully reserved rights on coverage for the Hartford Policies in effect from February 8, 2005 to February 8, 2010. (*Id.*) On September 1, 2009, Hartford agreed to participate in the defense of the CBM Defendants' defense of the Underlying Third-Party CBM Action under the same Hartford Policies in the Underlying Action and subject to the same full reservation of rights. (*Id.* at ¶ 23).

## V.     The Rockford Policy

Rockford issued a CONPAC Business owners policy to Pawel effective from March 3, 2005 through March 3, 2006. (*Id.* ¶ 32.)

### A.     Policy Coverage

The Rockford Policy provides that Rockford "will pay those sums that the insured becomes legally obligated to pay as damages because of 'bodily injury,' 'property damage' or 'personal and advertising injury' to which this insurance policy applies." (*Id.* ¶ 33(A).) The Rockford Policy further states that Rockford will "have the right and duty to defend the insured against any 'suit' seeking those damages" but will have no duty to defend the insured against "any 'suit' seeking damages for 'bodily injury,' 'property damage,' or 'personal and advertising injury' to which this insurance policy does not apply." (*Id.*) "Property damage" under the terms of the policy is defined as "(a) [p]hysical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or (b) [l]oss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the same time of the 'occurrence' that caused it." (*Id.* ¶ 33(F).) According to the terms of the policy, this insurance applies to bodily injury and property damage only if "[t]he 'bodily injury' or 'property damage' is caused by an 'occurrence' that takes place in the 'coverage territory.' " (*Id.* ¶ 33(A).) "Occurrence" is defined under the

11

terms of the policy as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (*Id.* ¶ 33(F).)

The Rockford Policy names the following individuals and entities as additional insured with respect to liability arising out of Pawel's ongoing operations performed for that insured: Nancy Gidwitz & Jeff Grossman; Jay & Jean Kaiser; KGP, Inc.; Kaiser Design Group, Ltd.; and Kaiser Guthem Partnership, LLC. (*Id.* ¶ 37.)

### B.       Policy Exclusions

The Rockford Policy further states that it does not apply to (1) bodily injury or property damages that is expected or intended from the standpoint of the insured; (2) bodily injury or property damage for which the insured is obligated to pay damages by reason of the assumption of liability in a contractual agreement; (3) property damage to (i) a particular part of real property on which the insured or any contractor or subcontractor working directly or indirectly on the insured's behalf is performing operations, if the property damage arises out of those operations, or (ii) a particular part of any property that must be restored or replaced because "your work" was incorrectly performed on it; (4) property damage "to 'your product' arising out of it or any part of it"; (5) property damage "to 'your work' arising out of it or any part of it; and (6) property damage to "impaired property"[2] or property that has not been physically injured, arising out of (i) a defect, deficiency, inadequacy or dangerous condition in 'your product' or 'your work,' " or (ii) "[a] delay or failure by you or anyone acting on your behalf to perform a contract or

---

[2] "Impaired Property" is defined under the terms of the Rockford Policy as "tangible property, other than 'your product' or 'your work' that cannot be used or is less useful because (i) it incorporates 'your product' or 'your work' that is known or thought to be defective, deficient, inadequate, or dangerous; or (ii) the insured has failed to fulfill the terms of a contract or agreement and such property can be restored to use by the repair, replacement, adjustment, or removal of 'your product' or 'your work' or by fulfilling the terms of the contract or agreement. (Rockford 56.1 St. ¶ 33(F).)

agreement in accordance with its terms." (*Id.* ¶ 33(B).)  This final exclusion "does not apply to the loss of other property arising out of sudden and accidental physical injury to 'your product' or 'your work' after it has been put to its intended use.

The Rockford Policy defines "your product" as "[a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of" by either the insured, others trading under the insured's name, or a person or organization whose business or assets the insured has acquired. (*Id.* ¶ 33(F).)  The term "your work" is defined as "[w]ork or operations" performed by the insured or on the insured's behalf and "[m]aterials, parts or equipment furnished in connection with such work operations." (*Id.*)  These definitions include "[w]arranties or representations made at any time with respect to the fitness, quality, durability, performance or use" of "your product" or "your work" and [t]he providing of or failure to provide warnings or instructions." (*Id.*)

C.    **Policy Conditions**

The Rockford Policy provides that the insured "must see to it that we are notified as soon as practicable of an 'occurrence' or an offense which may result in a claim. (*Id.* ¶ 33(E).)  To the extent possible, such notice should include: (1) how, when, and where the 'occurrence' or offense took place; (2) the names and addresses of any injured persons and witnesses; and (3) the nature and location of any injury or damage arising out of the 'occurrence' or offense. (*Id.*)  In the event that a claim is made or a suit is brought against the insured, the insured must immediately record the specifics of the claim or suit, the date it was received, and notify Rockford as soon as practicable. (*Id.*)  The Rockford Policy further states that the insured must: (1) immediately send Rockford copies of any demands, notices, summonses, or legal papers received in connection with the claim or suit; (2) authorize Rockford to obtain records and other

information; (3) cooperate with Rockford in the investigation, settlement, or defense of the claim or suit; and (4) assist Rockford, upon request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which the policy may also apply. (*Id.*)

Rockford did not receive notice of Gidwitz's original underlying complaint, the Kaiser Defendants' original underlying third-party complaint, or the incidents giving rise to either complaint until it received a letter from Pawel dated March 31, 2010. (*Id.* ¶ 30.)

## STANDARD OF REVIEW

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513–14 (1986). However, the Court will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. Of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted by the opposing party, the Court will accept that statement as true for the purposes of summary judgment. The non-moving party must present more than a "bald assertion of the general truth" in the form of "affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Drake v. Minnesota Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998).

The parties agree that the insurance policies at issue are governed by Illinois law, and the Court will apply Illinois law. *Auto–Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) ("Courts do not worry about conflict of laws unless the parties disagree on which state's law applies.") (internal citation and quotation marks omitted). Specifically, the Court will "apply the law that [it] believe[s] the Supreme Court of Illinois would apply if the case were before that tribunal rather than before this court." *Help at Home, Inc. v. Med. Capital*, L.L.C., 260 F.3d 748, 753 (7th Cir. 2001). Under Illinois law, "[t]he construction of an insurance policy and a determination of the rights and obligations thereunder are questions of law for the court which are appropriate subjects for disposition by way of summary judgment." *Crum & Forster Managers Corp. v. Resolution Trust Corp.*, 620 N.E.2d 1073, 1079 (Ill. 1998).

## DISCUSSION

Each of the Moving Insurers has filed separately for summary judgment against the Kaiser Defendants.  Each of the Moving Insurers has a separate insurance policy or series of policies with the Kaiser Defendants as named or as additional insureds, but each policy uses identical language, consistent with CGL policies generally, with respect to both the scope of covered property and the definition of "occurrence" as accidental.  Therefore, this Opinion addresses first the common question relevant to all three Moving Insurers vis-à-vis the Kaiser Defendants:  whether the Underlying Complaint alleges "property damage" as the result of an "occurrence" within the meaning of a CGL Policy under Illinois law.

### I.  Duty to Defend the Underlying Action

Under Illinois law, "to determine whether an insurer's duty to defend has been triggered, a court must compare the allegations in the underlying complaint with the language in the insurance policy."  *Lagestee-Mulder, Inc. v. Consolidated Ins. Co.*, 682 F.3d 1054, 1056 (7th Cir.

2012) (citing *Gen. Agents Ins. Co. of Am., Inc. v. Midwest Sporting Goods, Inc.*, 828 N.E.2d 1092, 1098 (Ill. 2005)). The duty to defend is broader than the duty to indemnify because "an insurance company must defend its insured in actions that are even *potentially* within coverage." *Id.* (citing *CMK Development Corp. v. West Bend Mut. Ins. Co.*, 917 N.E.2d 1155, 1163 (Ill. 2009)). It is the factual allegations contained in the underlying complaint that determine whether a duty to defend exists; "if the underlying complaint alleges facts within or potentially within policy coverage, an insurer is obligated to defend its insured even if the allegations are groundless, false or fraudulent." *Gen. Agents Ins.*, 828 N.E.2d at 1098. Since the duty defend is broad enough to include claims only potentially within coverage, it must be clear from the face of the underlying complaint that the stated facts do not fall within the policy's coverage. *Lagestee*, 682 F.3d at 1056; *see also Amerisure Mutual Ins. Co. v. Microplastics, Inc.*, 622 F.3d 806, 815 (7th Cir. 2010).

In Illinois, "damage to a construction project resulting from construction defects is not an 'accident' or 'occurrence' because it represents the natural and ordinary consequence of faulty construction." *Lyerla v. AMCO Ins. Co.*, 536 F.3d 684, 689 (7th Cir. 2008); *Stoneridge Dev. Co., Inc. v. Essex Ins. Co.*, 888 N.E.2d 633, 650 (Ill. App. 2008) (citing *Viking Const. Mgmt., Inc. v. Liberty Mut. Ins. Co.*, 831 N.E.2d 1 (Ill. App. 2005)). As one court stated, "[a] CGL policy does not cover an accident of faulty workmanship but rather faulty workmanship that causes an accident." *Pekin Ins. Co. v. Richard Marker Assocs., Inc.*, 682 N.E.2d 362, 366 (Ill. App. 1997) (quoting *Western Cas. & Surety Co. v. Brochu*, 475 N.E.2d 872, 878 (Ill. 1985)). In other words, in order for a construction defect to qualify as an "occurrence," it must damage something other than the project itself. *See Monticello Ins. Co. v. Wil–Freds Constr., Inc.*, 661 N.E.2d 451, 456–57 (Ill. 1996). In *Lyerla*, the Seventh Circuit applied Illinois law to the same policy language at

issue here under very similar factual circumstances. In that case, the underlying plaintiff hired a general contractor to build a house according to certain specifications, and the homeowner sued for breach of contract when the contractor failed to build the house according to the specifications and in a workmanlike manner. 536 F.3d at 686–87. In the underlying suit, the homeowners sought damages for the costs of fixing the house, as well as storage fees and finance charges. *Id*. at 687. The court noted that the complaint in that case, just like the operative complaint in this case, was one for breach of contract seeking the costs of fixing defective work, Illinois precedent "strongly supports ... the conclusion that the [homeowners'] allegations of defective work do not constitute an 'accident' or 'occurrence,' " and consequently found that the insurer had no duty to defend the suit. *Id.* at 690. Similarly, in *Wil–Freds*, the court found no duty to defend a contractor after a municipality alleged the contractor breached their construction contract when a parking garage began to crumble and leak. *See Wil-Freds*, 661 N.E.2d at 452, 457 (finding "we are faced merely with an occurrence of alleged negligent manufacture" and "the construction defects set forth in [the complaint] do not constitute an occurrence within the definition in the CGL policy.") *Lyerla*, *Wil–Freds*, and the cases they cite make clear that in cases in which the building owners were only suing for damages to fix the faulty construction, and not for damage to other property nearby, no "occurrence" exists.

Therefore, the question as to whether the damage Gidwitz suffered could be an "occurrence" notwithstanding the clear allegations of faulty construction depends upon whether or not the damages cover property other than that property built pursuant to the construction contract, such that the Underlying Complaint alleges "property damage" to trigger the duty to defend. If it does, then each of the Moving Insurers may be obligated under their respective Policies to at a minimum defend, if not indemnify, KGP and possibly the other Kaiser

Defendants. If the complaint does not allege damage to covered property then the insurers have no such duty.

The law regarding the scope of property damage necessary to trigger the duty to defend under comprehensive general liability policy provisions in Illinois is settled. There is no coverage where the underlying suit alleges a scope of damages that extends only to the construction project itself as a result of construction defects or faulty workmanship. *Lagestee*, 682 F.3d at 1057. If the alleged damage to property other than the property that was the subject of the construction project, coverage exists. *Id.* (citing *Lyerla v. AMCO Ins. Co.*, 536 F.3d 684, 688 (7th Cir. 2008). The Illinois Supreme Court has explained why this rule exists:

> Comprehensive general liability policies ... are intended to protect the insured from liability for injury or damage to the persons or property of others; they are not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses. [citations omitted] Finding coverage for the cost of replacing or repairing defective work would transform the policy into something akin to a performance bond.

*Travelers Ins. Co. v. Eljer Mfg., Inc.* 757 N.E.2d 481, 503 (Ill. 2001) (quoting *Qualls v. Country Mut. Ins. Co.*, 462 N.E.2d 1288, 1291 (Ill. 1984). The Illinois Appellate Court has pointed out a further injustice if this rule were not the case, because unlike a surety on a performance bond, an insurer under a comprehensive general liability policy does not have the right to bring suit against the contractor who avails himself of the insurance policy for payout to a customer who successfully sues on grounds of faulty construction. *See CMK Development Corp.*, 917 N.E.2d at 1167.

The recent analyses in *Lagestee* and in *Microplastics* specifically refute the Kaiser Defendants' defense that the unspecified damages for negligence in Counts V and VI of the Underlying Complaint should be construed to constitute potentially covered damage, thereby

triggering the duty to defend. In both *Lagestee* and *Microplastics*, the underlying complaint alleged general liability for property damage; both cases looked to the specific facts alleged in the underlying complaints in order to interpret whether those unspecified defects could constitute potentially covered defects and found no facts to support that implied theory. *See Lagestee*, 682 F.3d at 1059; *Microplastics*, 622 F.3d at 812-14. In both cases, finding no factual allegations that would constitute covered damage, the courts found no duty to defend existed. While recognizing that general allegations did not "logically foreclose the theoretical possibility" that the complaint alleged damage to covered property, "implied claims that are not specifically alleged can be ignored," and legal "scenarios that are not literally inconsistent with the unhappy buyer's allegations" were not sufficient to trigger the duty to defend under a CGL policy. *Microplastics*, 622 F.3d at 808, 812 (citing *Del Monte Fresh Produce N.A., Inc. v. Transportation Ins. Co.*, 500 F.3d 640, 644 (7th Cir. 2007).

As with the underlying pleadings before the courts in *Lagestee* and *Microplastics*, the Underlying Complaint alleges the legal conclusion that "Gidwitz has incurred substantial and consequential damages including … other direct, consequential and/or incidental damages." But the facts pleaded in Underlying Complaint in support of this damage conclusion allege entirely damage to the structure that was built pursuant to the contract between Gidwitz and KGP. Indeed, *Microplastics* specifically addressed consequential damages flowing from defective products and held they do not trigger a duty to defend. *See Microplastics*, 622 F.3d at 811 (finding that when a claim has "all the earmarks of a buyer's breach of contract claim for products that failed to meet the agreed specifications" the damages also included consequential damages in the form of related costs incurred by the customer).

The cases upon which the Kaiser Defendants rely to support potential liability are distinguishable. *Milwaukee Mutual v. J.P. Larsen, Inc.*, 956 N.E.2d 524 (Ill. App. 2011), upon which the Kaiser Defendants rely, found a duty to defend under a CGL policy specifically because the damages from the insured's faulty construction of windows in a condominium building resulted in damage to the common areas of a building, the units within the building, and the personal property of the residents of the units. *Pekin Ins. Co. v. Richard Marker Assocs., Inc.*, 682 N.E. 2d 362 (Ill. App. 1997) likewise determined the existence of duty to defend an insured because defects in construction of home plumbing allegedly damaged the homeowner's furniture, clothing, and antiques. These cases are consistent with *Lagestee* and *Microplastics* as well as recent cases within this district in that they reviewed the specific factual allegations in the underlying complaint in order to determine whether the damages concerned covered property. *See also. Philadelphia Indemn. Ins. Co. v. 1801 W. Irving Park, LLC*, 2012 WL 3482260 *5 (N.D. Ill. Aug. 13, 2012) (duty to defend under a CGL policy arose because the complaint for breach of contract and construction defects also alleged damage to personal property in storage units and vehicles parked in a common garage area). Each of the specified damages in the Underlying Complaint, by contrast, are damages to the home that was built as a result of the Kaiser Defendants' contract with Gidwitz together with natural consequential damages, such as rent for alternate housing, flowing from the repair of the defective property. These damages are precisely those that are not covered by CGL policies, and cannot create a duty to defend on the part of the Moving Insurers.

## II. Subcontractor Exception & Policy Exclusions

The Moving Insurers each assert that one or more other exclusions to coverage in each of their respective Policies should apply and block any duty to defend on alternative grounds than

no covered property and no occurrence. The Kaiser Parties, in turn, assert that because one or more subcontractors performed the faulty work the Policies' "subcontractor exception" to any exclusions should apply. Under Illinois law, "an exception to an exclusion does not create coverage or provide an additional basis for coverage, but rather, merely preserves coverage already granted in the insuring provision." *Stoneridge*, 888 N.E.2d at 757. The courts in *Lyerla* and *Stoneridge*, in situations analogous to those here, rejected arguments based on the subcontractor exception similar to those that the Kaiser Parties make here. Those courts reasoned that because there was no "occurrence" or "property damage", and thus no coverage, there was no reason to reach the policy's exclusions and exceptions to those exclusions. *Id.* at 756–57 (noting that the subcontractor exception "cannot negate the lack of an 'occurrence' here"); *Lyerla*, 536 F.3d at 692 ("Because the underlying complaint does not contain allegations creating coverage, we need not consider an exception that restores coverage.") As in those cases, there is no "occurrence" or "property damage" here pursuant to the terms of each of the Moving Insurers' Policies and the Court will not delve into any exceptions to coverage that does not exist in the first instance.

## CONCLUSION AND ORDER

For the foregoing reasons, the Moving Insurers' motions for summary judgment are granted. Status is set for September 4, 2013 at 9:00 a.m. to discuss if there are any further matters to be handled by the Court.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois

Date: August 19, 2013